# In the United States Court of Federal Claims

No. 22-404 C

Filed: March 15, 2023[*]

```
* * * * * * * * * * * * * * ** *
                               *
TRACE SYSTEMS INC.,            *
                               *
              Plaintiff,       *
                               *
         v.                    *
                               *
THE UNITED STATES,             *
                               *
              Defendant,       *
                               *
and                            *
                               *
GENERAL DYNAMICS               *
INFORMATION TECHNOLOGY, INC.,  *
                               *
         Defendant-Intervenor. *
                               *
  * * * * * * * * * * * * * * ** *
```

*Lee Dougherty*, Effectus PLLC, with whom was *Everett Dougherty*, Effectus PLLC, *Daniel Forman*, *Cherie Owen*, and *Isaac Schabes*, Crowell & Moring LLP, all of Washington, D.C., for Plaintiff.

*Reta E. Bezak*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for Defendant.

*Noah B. Bleicher*, with whom was *Nathan E. Castellano*, *Scott E. Whitman*, and *Carla J. Weiss*, Jenner & Block, LLP, all of Washington, D.C., for Defendant-Intervenor.

## OPINION AND ORDER

**SOMERS**, Judge.

This bid protest involves a United States Air Force solicitation for a contract to provide communications technical support services ("CTSS") to the Air Force Central Command mission

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties provided proposed redactions of confidential or proprietary information. In addition, the Court made minor typographical and stylistic corrections.

in Southwest Asia.  On June 29, 2020, the Defense Information Systems Agency ("DISA") released Solicitation No. HC102819R0009 ("solicitation") for CTSS IV.  The agency awarded the contract to Plaintiff, Trace Systems, Inc., on September 3, 2021.  After several offerors filed protests before the General Accountability Office ("GAO") challenging the award on various grounds, the agency took corrective action, and the GAO protests were dismissed as academic.  As part of this corrective action, on March 3, 2022, the agency decided to cancel the CTSS IV RFP and resolicit it at a later date and, as a result, cancel the award of the CTSS IV contract to Plaintiff.  In addition, to facilitate the re-solicitation of the contract, the agency determined that it would extend the CTSS III bridge contract, on a sole-source basis, to the incumbent, Defendant-Intervenor, General Dynamics Information Technology, Inc. ("GDIT").

On April 7, 2022, Plaintiff filed a complaint in this Court challenging the agency's decisions.  On April 12, 2022, the government filed a notice with the Court indicating that it had decided to take corrective action by rescinding the challenged cancellation and sole-source decisions.  On April 19, 2022, the agency issued a memorandum rescinding the March 3, 2022, cancellation memorandum but reaffirming its decision to terminate the CTSS IV award for convenience because the agency's requirements had substantially changed, and redundant evaluation criteria impaired the agency's ability to fairly evaluate proposals.  The agency also issued a CTSS III Justification and Approval ("J&A") memorandum extending the sole-source bridge contract award to GDIT through September 9, 2023.  The government filed the cancellation memorandum and the J&A with the Court on April 19, 2022.

After the Court issued an opinion addressing apparent issues with the administrative record, *Trace Sys. Inc. v. United States*, 160 Fed. Cl. 691 (2022), on June 30, 2022, the government filed a motion to remand this protest to DISA to allow the agency to reconsider the decisions at issue.  The Court granted the motion on July 26, 2022.  After reconsideration, the agency rescinded its earlier decision but concluded that it remained in its best interest to cancel and resolicit the procurement, cancel the CTSS IV award to Plaintiff, and extend GDIT's bridge contract while a new competitive procurement was undertaken.  AR 23380–23401.  The agency's decision to cancel and resolicit the procurement was based on three factors: (1) an appearance of an organizational conflict of interest ("OCI") involving multiple offerors who competed for the award of CTSS IV, including Plaintiff; (2) redundant evaluation criteria; and (3) changes in the requirements.  AR 23380.

After remand and the agency's issuance of a new cancellation memorandum, Plaintiff filed its third amended complaint with this Court on September 23, 2022.  Thereafter, Plaintiff filed a motion for judgment on the administration record, asking the Court to determine that the agency's actions related to the cancellation of the CTSS IV procurement were irrational and to permanently enjoin the agency from cancelling the CTSS IV procurement.  The government and GDIT filed cross motions for judgment on the administrative record asserting that the agency's decisions to cancel the CTSS IV award, resolicit it, and extend GDIT's bridge contract were reasonable based on potential OCIs, redundant criteria, and changed requirements.  GDIT also moved the Court to dismiss count II of Plaintiff's complaint, related to the bridge contract, for lack of standing.  For the following reasons, the Court denies Plaintiff's motions for judgment on the administrative record and for a permanent injunction, grants GDIT's motion to dismiss

count II of the complaint, and grants the government's and GDIT's motions for judgment on the administrative record.

## BACKGROUND

Since 2003, various contractors have provided communications technical support services to the United States Air Force Central Command mission in Southwest Asia ("SWA").  AR 4–6.  The first contract, CTSS I, "was an unrestricted single-award procurement by SPAWAR System Center Atlantic, developed in early 2001 to perform communications operation and maintenance at U.S. military bases in the [United States Central Command Area of Responsibility]" and was awarded to Systex Inc.  AR 6.  Its successor, CTSS II, was awarded to Lockheed Martin in 2007.  AR 4–5.  In 2015, CTSS III, a single-award, indefinite-delivery, indefinite-quantity, was awarded to GDIT.  AR 4, 15156.  CTSS III was awarded as a five-year contract with an option to extend for six months and was set to end in June 2021.  AR 4.  For the last five years, GDIT has performed CTSS III, providing the Air Force with communication services in the SWA Area of Responsibility. *See* AR 15156.  The solicitation at issue in this case is for CTSS IV.

### A.    CTSS IV Procurement

On June 29, 2020, DISA released the solicitation for CTSS IV.  AR 44.  The CTSS IV contract was to provide "mission critical communications capabilities supporting joint services military personnel and coalition forces, primarily in the [United States Central Command Area of Responsibility]," such as Bahrain, Jordan, Kuwait, Oman, Qatar, United Arab Emirates, Afghanistan, Pakistan, Iraq, and Saudi Arabia.  AR 70, 99.  In the solicitation for CTSS IV, the agency reserved the right to "conduct discussions or seek clarifications if the Contracting Officer [] determines they are necessary."  AR 1446.  The agency also "reserve[d] the right to withdraw and cancel the solicitation" in the event that "issues pertaining to a proposed contract cannot be resolved" to the source selection authority's ("SSA") or contracting officer's satisfaction.  AR at 663, 735.  CTSS IV was "a best value trade off source selection conducted in accordance with Federal Acquisition Regulation (FAR) 15.3."  AR 1446.  The best value determination was based on several non-price and cost/price evaluation factors.  *See* AR 1447.

Seven offerors, including Plaintiff and GDIT, submitted proposals for CTSS IV in August 2020.  AR 1842–8066.  On August 30, 2021, the SSA determined that Plaintiff's proposal offered the best value to the government and selected Plaintiff for contract award.  AR 18586, 18845–46.  On September 3, 2021, the contracting officer for CTSS IV informed Plaintiff of the award.  AR 18867–68.

### B.    GAO Protests

After the award to Plaintiff, three disappointed offerors—GDIT, Salient, and Vectrus—filed bid protests with GAO, challenging various aspects of the CTSS IV competition.  AR 20022–21670.  GDIT's protest alleged that the CTSS IV procurement was "irredeemably tainted by multiple unmitigated conflicts of interest."  AR 20832.  GDIT asserted that during the CTSS IV procurement, Plaintiff used the services of employee, John DeBerry, the recently former Chief of Plans and Requirements for the U.S. Air Forces Central Command ("AFCENT") A-6,

and subcontractor, ████████████████████, who served as the prime contractor on AFCENT's Network Operations and Security Center ("NOSC") information technology support services procurement.  AR 20832, 20841, 20843.  GDIT argued that this resulted in an OCI, giving Plaintiff an unfair advantage in the procurement for CTSS IV.  AR 20832.  GDIT also alleged that the agency "misevaluated" the proposals by giving Plaintiff strengths it was not entitled to and failing to give GDIT strengths it should have received.  *Id.*

Salient's protest alleged that (1) the agency held "unequal discussions with Trace," (2) the agency's best-value trade-off decision was unreasonable due its flawed evaluation of the proposals, and (3) there was an OCI issue involving Plaintiff's employee, John DeBerry, and its subcontractor, ████████████████.  AR 20762.  Vectrus' protest alleged that the agency engaged in "misleading and unequal discussions," misevaluated Plaintiff's proposal, and "ignored numerous strengths" in Vectrus' proposal.  AR 20022.  Due to these GAO protests, the agency ordered Plaintiff to stop work on the CTSS IV contract on September 20, 2021.  AR 20021.

After reviewing the GAO protests, the agency decided to take corrective action.  The agency stated that it would

> review its evaluation of the offerors' final proposal revisions, to include the offerors' Organizational Conflict of Interest statements and mitigation plans. After this review, if the Awardee's proposal is determined not to be the best value to the Agency or ineligible for award, the Agency will re-evaluate the final proposal revisions of the offerors remaining in the competitive range and issue an award decision. The Agency may reopen discussions with the offerors that remain in the competitive range. The Agency may amend the RFP to ensure it best represents that Agency's requirements. If the Agency amends the RFP or reopens discussions, the Agency will solicit revised proposals from the offerors remaining in the competitive range and make an award decision to the offeror whose proposal represents the best value to the Agency. If revised proposals are requested, the Agency will disclose the total evaluated price and technical color ratings of all offerors. *See Ocean Services, LLC*, B-292511.2, Nov. 6, 2003, 2003 CPD ¶ 206. The offerors' names will not be disclosed. If it is determined that the RFP no longer meets the Agency's needs, the Agency will cancel the RFP. Offerors will be given notice of any cancellation of the RFP.

AR 21671–72.  Plaintiff did not challenge the agency's decision to take corrective action.  Nor did it object to the agency's assertion that it would "cancel the RFP" if the RFP no longer met the agency's needs.  As a result of the agency's corrective action, the GAO dismissed the protests as academic on October 12 and 14, 2021.  AR 21680–85.

## C.    Corrective Action

After GAO dismissed the protests, the agency undertook corrective action.  The agency issued evaluation notices ("EN") to Plaintiff and several other CTSS IV offerors.  In its EN to Plaintiff, the agency asked for more information related to the OCI allegations regarding Mr. DeBerry and ████.  *See* AR 22396–98.  The agency conducted interviews and reviewed the

contract file for evidence of "biased ground rules or impaired objectivity OCIs" in both Plaintiff's and Salient's proposals. AR 22579.  The agency also reviewed the protest allegations related to technical evaluation.  *Id.*  The contracting officer documented these efforts in two memoranda: Memorandum For Record (February 28, 2022), AR 22517–26, and Memorandum For Record – Analysis of Potential Organization Conflict of Interest (March 31, 2022), AR 22560–826.  In these memoranda, the contracting officer concluded that it was in the agency's best interest to "terminate Trace's CTSS IV contract, cancel the current CTSS IV RFP, and transfer the CTSS IV requirement to AMIC for resolicitation" because the requirements had changed, some evaluation criteria were redundant, and there was "an appearance of a potential unequal access to information OCI."  AR 22518–19, 22560.

On March 3, 2022, the agency issued a cancellation memorandum to all offerors, informing them that the CTSS IV contract awarded to Plaintiff was terminated and that the "acquisition [was] anticipated to be re-solicited at a later date."  AR at 22528, 23027, 22540.  On March 28, 2022, the agency issued a J&A for a modification to the CTSS III bridge contract. AR 22839.  The agency approved "the use of other than full and open competition" for the extension of CTSS III "pursuant to the authority of FAR 6.0302-1, only responsible source and no other supplies or services will satisfy agency requirements."  AR 22833.  As a result, the agency extended GDIT's bridge contract through December 9, 2023.  AR 22834.

In the J&A, the agency determined that this sole-source extension would "allow for task order extensions and ensure continued support of this vital program during the resolicitation, award, and transition of the follow-on, while retaining the ability to provide a consistent level of effort for USAFCENT without a break in service."  AR 22835.  The agency also concluded that the incumbent, GDIT, was the only source that could fulfill contract requirements without risking "mission critical failure" and "a substantial break in service and support to USAFCENT." AR 22836.

**D.      The Instant Protest and Remand**

On April 7, 2022, Plaintiff filed a complaint in this Court challenging the agency's decisions to cancel the CTSS IV procurement and extend the bridge contract to GDIT.  ECF No. 1 ("Compl.").  Plaintiff asked the Court to restore Plaintiff's award of the CTSS IV contract and enjoin the agency from extending the CTSS III bridge contract to GDIT.  *See id.* at 18.  On April 12, 2022, the government filed a notice with the Court indicating that it had "decided to take corrective action by rescinding the challenged sole-source and cancellation decisions."  ECF No. 11.

On April 19, 2022, the agency issued a memorandum rescinding the March 3, 2022, cancellation memorandum and reaffirming the contracting officer's decision to terminate the CTSS IV award for convenience because "the Government's requirements changed substantially, and redundant evaluation criteria impaired the Government's ability to evaluate proposals fairly."  AR 23040–41.  The agency also issued a J&A rescinding the March 28, 2022, J&A and extending the sole-source bridge contract award to GDIT through September 9, 2023, pursuant to FAR 6.302-1 and FAR 6.302-2.  AR 23017.  The government filed the memorandum and the J&A with the Court on April 19, 2022.  ECF Nos. 19-1, 19-2.

5

Several months later, on June 30, 2022, following the Court's June 27, 2022, memorandum opinion and order, *Trace Sys. Inc. v. United States*, 160 Fed. Cl. 691 (2022), the government filed a motion to remand this case to DISA to "permit the agency to reconsider the decisions at issue in this protest." ECF No. 67 at 1. The Court granted this motion on July 26, 2022. ECF No. 76. DISA reconsidered its decisions to cancel the CTSS IV procurement and to award a sole-source bridge contract to GDIT. ECF No. 78 at 1. After reconsideration, DISA rescinded its previous decision and issued a new decision that again concluded it was in the agency's best interest to cancel and resolicit the procurement, cancel the CTSS IV award, and extend GDIT's bridge contract while a new competitive procurement was undertaken. *Id.*; ECF Nos. 78-1, 78-2.

On August 31, 2022, the agency issued a memorandum memorializing this decision and rescinding the April 19, 2022, cancellation memorandum. AR 23380–401. The agency's decision to cancel and resolicit the procurement was based on three factors: "(1) an appearance of an OCI involving multiple offerors who competed for the award of CTSS IV, including Trace; (2) redundant evaluation criteria; and (3) changes in the requirements." AR 23380. The government filed this memorandum with the Court on September 2, 2022. ECF No. 78-1. Thereafter, Plaintiff filed its third amended complaint, on September 23, 2022, realleging its challenges to the agency's decision to cancel the CTSS IV procurement and extend the CTSS III sole-source bridge contract to GDIT and adding a new claim alleging that the agency violated competitive requirements by allowing Steven Dawson, a former GDIT employee, to participate in the CTSS IV procurement and the sole-source bridge contract decision. ECF No. 88.

## E.   CTSS IV Cancellation Memorandum

The agency's August 31, 2022, decision to cancel the CTSS IV procurement, AR 23380–23401, was based on three factors, which were detailed in the memorandum: "(1) an appearance of an OCI involving multiple offerors who competed for the award of CTSS IV, including Trace; (2) redundant evaluation criteria; and (3) changes in the requirements." AR 23380.

### 1.   OCI

In their GAO protests, Salient and GDIT "raised OCI allegations by arguing that Trace gained an unfair competitive advantage by having unequal access to information through: (1) employment of Mr. DeBerry who was a high[-]ranking AFCENT official; and (2) teaming with ███, a prime contractor on AFCENT's NOSC contract." *Id.* Additionally, "Trace alleged as part of its amended complaint that Mr. Steven Dawson ha[d] improperly influenced the Government's decision to terminate CTSS IV award to Trace and to extend the CTSS III bridge contract to GDIT." AR 23380–81. The contracting officer "conducted multiple investigations into the[se] OCI allegations and an investigation into a possible violation of the [Procurement Integrity Act ('PIA')]." *Id.* Her investigations examined: "(1) OCI allegations involving Trace and Salient; and (2) OCI allegations involving Mr. Steven Dawson and possible ethical violations centering around Mr. Dawson's involvement in the signing of the Justification and Approval (J&A) on April 19, 2022." *Id.* After conducting her investigations, the contracting officer concluded that: "(1) there [was] an appearance of an OCI involving Trace and Salient; (2)

there [was] no OCI involving Mr. Dawson; (3) there [was] no PIA violation involving Mr. Dawson; and (4) there appear[ed] to be a violation of 5 Code of Federal Regulations 2635.502 involving Mr. Dawson." *Id.*

First, the contracting officer determined that there was "an appearance of an unequal access to information OCI involving Trace, due to its decision to employ Mr. DeBerry and utilize him in the preparation of their proposal in response to the CTSS IV RFP." AR 23382. According to the contracting officer,

> Mr. DeBerry had access to non-public, competitive, and proprietary information while employed as the Division Chief of AFCENT A6X Division that oversaw the performance of CTSS III contract where GDIT is the prime contractor. Moreover, the investigation revealed that Trace appears to have utilized Mr. DeBerry, an individual with knowledge of non-public, proprietary, and competitively useful information in preparation of the proposal submitted in response to the RFP.

*Id.* As a result, the contracting officer concluded that there was an appearance of an unequal access OCI regarding Mr. DeBerry. *Id.*

The contracting officer also determined that there was "an appearance of an unequal access to information OCI involving Salient due to their decision to hire ███████████ and utilize his services during proposal preparation for CTSS IV RFP." AR 23385. The contracting officer found that as Communications Director of the A6 Division from 2017 to 2019, ███████ had access to information regarding CTSS III and CTSS IV that was "not publicly available or publicly known in the industry." *Id.* According to an interview with ███████, he "helped prepare Salient's proposal in response to the CTSS IV RFP and [] he specifically utilized his knowledge from the time at AFCENT to form Salient's pricing strategy." *Id.* As a result, the contracting officer concluded that there was "an appearance that Salient utilized an individual with knowledge of non-public, proprietary, and competitively useful information in preparation of the proposal submitted in response to the RFP." AR 23385–86.

Based on the above findings, the contracting officer determined that "the CTSS IV solicitation did not meaningfully address potential OCI issues, particularly in light of the fact that personnel move between AFCENT and government contractors fairly regularly." AR 23390–91. She concluded that "the cumulative effect of the evidence involving OCI issues [was] serious enough for a reasonable person to seriously consider the cancellation of the CTSS IV RFP." *Id.*

### 2. Redundant Evaluation Criteria

The offerors' GAO protests also challenged the agency's evaluation of the protestors' technical solutions. AR 23391. In response, the contracting officer investigated these allegations and noted that "some of the evaluation criteria in CTSS IV RFP were redundant and unclear in certain critical areas." *Id.* She determined that the "evaluation criteria expressed in the RFP did not clearly explain whether one aspect of an offeror's technical solution could be considered a strength under multiple subfactors in the Technical/Management Factor." AR 23391–92. Additionally, she concluded that "the way the evaluation criteria was written

impeded the Government's ability to effectively assign strengths under the four technical subfactors." *Id.* The contracting officer observed that

> [w]hile [she] d[id] not agree that the protestors' (GDIT, Salient, and Vectrus) allegations should have resulted in the Government assigning multiple strengths to protestor's solutions, [she] d[id] agree that the evaluation subfactors under the Technical/Management Factor impaired the effectiveness of the evaluation by repeatedly touching multiple areas of an offeror's proposal and artificially inflating the value of the proposed solutions. The CTSS IV RFP advised offerors that the Technical/Management Factor was significantly more important than the Small Business Participation Factor. Further, the Technical/Management Factor when combined with other evaluation factors, was significantly more important than Cost/Price Factor.

*Id.*

According to the contracting officer, the overlap in subfactors 1 and 2 created issues in assessing "whether an offeror should receive one strength for Subfactor 1 for their organizational structure, key personnel, and process to ensure successful performance, and one strength for Subfactor 2 for their staffing strategies, or should the offeror receive a total of one strength for these overlapping aspects of an offeror's proposal under either Subfactor." AR 23394. Moreover, the overlap in subfactors 2 and 3 created issues in assessing "whether an offeror should receive one strength for Subfactor 2 for their ability to recruit and on-board personnel and one strength for Subfactor 3 for the mobilization plan or should the offeror receive a total of one strength for these overlapping aspects of an offeror's proposal under either Subfactor." *Id.* Finally, the similarities in subfactors 3 and 4 created issues in assessing "whether an offeror should receive one strength for Subfactor 3 for their mobilization plan and one strength for Subfactor 4 for the same mobilization plan or should the offeror receive a total of one strength for their mobilization plan under either Subfactor." *Id.*

Put simply, according to the contracting officer, the redundancies in subfactors 1, 2, 3, and 4, created "an uncertainty with regard [to] the number of strengths that an offeror's solution c[ould] be assigned under the Technical/Management Factor." AR 23395. This uncertainty "degraded the Government's ability to determine which offeror's solution represented the overall best value to the Government, by artificially inflating the values of the proposed solutions." *Id.* As a result, the contracting officer determined that the agency's award to Plaintiff "was tainted by the flaws present in the RFP's evaluation criteria that appear to have been unreasonable and unfair to the other offerors." *Id.* Thus, the contracting officer recommended that it was "in the best interests of the Government to cancel the RFP and conduct a new procurement to ensure that the evaluations are conducted in a fair and reasonable manner." *Id.*

### 3. Changes in the Requirements

On July 8, 2022, the Air Force's Acquisition Management and Integration Center ("AMIC") "released a draft copy of some solicitation documents ('CTSS V') that will most likely be utilized in the procurement of the follow-on CTSS requirements." AR 23396. The

contracting officer and AFCENT's program office compared the requirements for CTSS IV and
CTSS V to inquire whether CTSS IV still reflected the agency's needs.  *Id.*  The contracting
officer found multiple changes in requirements.  First, CTSS V eliminated CTSS IV's
requirement for satellite communications operations and control center support at the
government facility located at Shaw AFB.  *Id.*  Second, CTSS V included a new requirement for
network operations that was not previously included in CTSS IV.  AR 23397.  Third, CTSS V
removed CTSS IV's requirement that offerors provide support in Afghanistan during the life of
the contract because the United States removed all armed forces from Afghanistan on August 30,
2021.  *Id.*  Fourth, CTSS V contained different, stricter requirements than CTSS IV for the
recruitment and replacement of key personnel.  AR 23398.  Finally, CTSS V had different
requirements for satellite communications ("SATCOM") and microwave support than CTSS IV.
*Id.*  While CTSS IV required an offeror to provide wide area network support starting on the date
of award, it did not require SATCOM and microwave support immediately.  *Id.*  It only required
that the offeror be capable of providing SATCOM and microwave support at some point during
the life of the CTSS IV contract.  *Id.*  CTSS V, on the other hand, required the offeror to provide
wide area network, SATCOM, and microwave support immediately.  *Id.*

The contracting officer determined that these changes, when combined, "demonstrate[d]
that the CTSS IV RFP did not portray Government requirements in an accurate manner."
AR 23399.  She concluded that a new procurement would ultimately "allow the Government to
have a contract that serves their adjusted requirements" and "ensure that the offeror's proposed
costs are as realistic as possible in determining the Government's most probable cost."  *Id.*  The
contracting officer also recommended that simply amending the CTSS IV RFP "was not in the
best interests of the Government" because "the cumulative effect" of the OCI issues, evaluation
criteria, and changes in the requirements would require "fundamental changes to the solicitation
and require offerors to update and resubmit their solutions."  *Id.*  According to the contracting
officer, "[t]he evaluation of the updated solutions [would] most likely take just as much time, if
not longer, when compared to cancelling the CTSS IV RFP, terminating CTSS IV award to
Trace, and transferring the reprocurement of CTSS requirement back to AMIC."  *Id.*  As a result,
the agency determined that it should "terminate the CTSS IV award to Trace for the
Government's convenience, [] cancel the CTSS IV RFP, and [] reprocure the CTSS
requirement."  AR 23400.

## F.       CTSS III Sole-Source Bridge Contract

On August 30, 2022, the agency issued a new J&A rescinding the April 19, 2022, J&A
and reaffirming the extension of the sole-source CTSS III bridge contract award to GDIT
through September 9, 2023, pursuant to FAR 6.302-1 ("only one responsible source and no other
supplies or services will satisfy agency requirements") and FAR 6.302-2 ("unusual and
compelling urgency").  AR 23179–23191.  The agency determined that "[d]ue to the termination
for convenience of CTSS IV. . . the incumbent contractor (GDIT) under CTSS III, who [was]
already in place in SWA with a workforce of ▅▅ full time equivalent employees, [was] the only
source that [could] immediately and completely fulfill this requirement ▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅."  AR 23184.

The agency concluded that GDIT was the only capable source that could immediately and completely fulfill the CTSS requirements until September 2023 for several reasons.  First, the agency asserted that mobilizing the workforce of a new contractor would bring the mission to a complete standstill for at least six months: "[i]f the CTSS III contract were to end abruptly and a new contract was in place to take over the work performed under CTSS III, then based on the Government's estimates it will take a new contractor approximately six months to be fully deployed" due to the extensive hiring, medical clearances, security clearances, training, and leasing processes required for CTSS contracts.  AR 23184.  "This would cause unacceptable delays to the continued support efforts causing operational failures."  *Id.*

Second, the agency concluded that it would be extremely difficult for a new contractor to staff the CTSS contract due to the strict and high-caliber credentials that Outside the Continental United States ("OCONUS") positions require.  According to the agency, "[i]t would have been unrealistic to expect any other offeror to meet the Government's fill rate under the current circumstances in under six months."  AR 23185.  Third, the agency stated that "[t]he Government would be unable to properly award a competitive interim contract before September 2023" due to the evaluation methodology required for CTSS contracts and the potential for any bid protest litigation in an already condensed timeline.  *Id.*  For example, DFARS 215.101-2-70 requires the government to use a "more onerous best value trade off (BVTO) contract evaluation methodology . . . [for CTSS contracts] which instructs the Government to avoid utilizing the more efficient lowest priced technically acceptable evaluation scheme . . . ."  *Id.*

Fourth, the agency determined that a competitive short-term contract would incur substantially higher costs than the costs for pre-negotiated contract rates presently utilized by GDIT.  *Id.*  The agency estimated that "a competitive contract for CTSS services with a period of performance from September 2022 to September 2023" would incur higher recruitment, employment, deployment, transition, and labor rate costs than the current bridge contract with GDIT.  *Id.*  Finally, "[a]n interim contract award between CTSS III and the CTSS V requirement" creates another 60-day transition period that would "drastically increase[] the risk of unacceptable performance."  AR 23186.  According to the agency, a "competition of a 12-month contract from September 2022 to September 2023 would cause the Government to incur substantial risk in incurring an additional transition period, at a higher cost, for a maximum of 10 months of performance that is not undergoing a transition."  *Id.*

Because of these reasons, the agency determined that GDIT was the only capable source that could provide CTSS services from June 10, 2022, until September 9, 2023, and thus concluded that a bridge contract with GDIT was necessary for the period while the Air Force resolicits CTSS V.  AR 23185–86.

The agency also concluded that its "need for operational and management support on the CTSS program" is of such an "unusual and compelling urgency" that the agency ████████ ███████████████ unless it was "permitted to limit the number of sources from which it solicits bids or proposals."  AR 23186; 48 C.F.R § 6.302-2(a)(2).  First, according to the agency,

> [a] break in service would have ███████████████ to the USCENTCOM mission across the AOR.  ████████████████████████████████



AR 23186.

Second, CTSS provides support for the Defense Red Switch Network ("DRSN"), which provides multilevel secure voice and voice conferencing capabilities to the National Command Authority.  AR 23187.  CTSS also supports the Legacy Defense Switch Network, which provides voice support to over 7,500 deployed warfighters, and all commercial satellite terminal operations and maintenance.  *Id.*  According to the agency, ███████████████████████████████ ████████████████████████████████████████  *Id.*  The agency also asserted that a "break in service would result in ███████████████████████ ████████████████████████████████████████████████████  [Additionally,] the U.S. military's ability ████████████████████████████████████ ███████"  *Id.*  Finally, as mentioned above, the agency determined it would be unable "to properly complete procurement of a competitive 12-month contract for CTSS services before September 2023" or "efficiently transition to a competitive 12-month contract for an interim bridge of CTSS services, then complete another transition of CTSS services by September 2023."  *Id.*

Accordingly, the agency determined that there was an urgent and compelling need for operational and management support on the CTSS program and, therefore, a bridge action to extend services to GDIT was necessary for the period while the Air Force resolicits CTSS IV. AR 23186.

## DISCUSSION

### A.  Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or to the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  In such actions, the Court reviews an "agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).  Under section 706, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  Thus, an agency's decision "may be set aside if (1) the procurement official's decision lacked a rational basis or (2) the procurement procedure involved a violation of regulation or procedure."  *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citations and internal quotations omitted).  Importantly, it is insufficient to merely demonstrate that an agency erred in its decision making; rather, the APA requires that "due account shall be taken of

the rule of prejudicial error." 5 U.S.C. § 706.  Accordingly, "[t]o prevail in a bid protest, a protestor must show a significant, *prejudicial* error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (emphasis added).

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), which requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005).  "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Sierra Nevada Corp.*, 107 Fed. Cl. 735, 751 (2012).  Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

## B.  Analysis

At oral argument on the cross-motions, Plaintiff attempted to make at least two arguments that fell outside of its briefing and thus were not properly before the Court in this protest.  Accordingly, before addressing the heart of the issues at stake in this bid protest, the Court believes it must delineate what is properly before it.  As discussed above, the protest arises out of a corrective action.  *See* AR 21671–72.  In that corrective action, the agency committed to review the solicitation and "[i]f it is determined that the RFP no longer meets the Agency's needs, the Agency will cancel the RFP."  AR 21672.  Despite its attempts to do so at oral argument, Plaintiff did not challenge that corrective action itself.  Plaintiff never alleged, nor did it argue in its motion for judgment on the administrative record, that the corrective action *itself* was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Rather, quite clearly, Plaintiff challenged the *result* of the corrective action: the August 31, 2022, memorandum cancelling the CTSS IV procurement.  Therefore, the protest before the Court is a challenge to whether the agency's decision to cancel the solicitation (the result of the corrective action) was rational.  The protest also properly contests (to the extent Plaintiff has standing) the agency's decision to sole-source award the bridge contract to GDIT.

Conversely, arguments related to whether the agency should have taken the corrective action in the first place, or complaints about the agency taking the actions it committed itself to take as part of the corrective action, are not part of this protest.  Also not before the Court is a direct challenge to the cancellation of the contract awarded to Plaintiff.  Such a challenge is not proper under the Court's bid protest jurisdiction.  Although the Court may have been permitted to reinstate that contract as part of its injunctive powers because the cancellation of the award flowed directly from the cancellation of the solicitation, a direct challenge to the cancellation is not proper here.

With these limitations in mind, the Court will turn to analyzing: (1) pursuant to the corrective action, cancellation of the solicitation; (2) the award of the sole-source bridge contract to GDIT; and (3) whether the agency acted in bad faith with respect to any of its decision-making related thereto.

### 1.  The Cancellation of CTSS IV was Reasonable

As discussed above, the contracting officer issued a memorandum for the record on August 31, 2022, announcing the agency's decision to cancel the CTSS IV RFP and, as a result, to terminate the CTSS IV award to Plaintiff.  AR 23380–401.  This memorandum also rescinded the previous cancellation memoranda.  Therefore, the August 31, 2022, cancellation decision constituted a new agency action, and it is that action, not any of the previous cancellation decisions, that the Court is charged with reviewing.[1]

In the agency's August 31, 2022, memorandum, the contracting officer determined that it was in the best interests of the agency to cancel the CTSS IV RFP and, consequently, the award to Plaintiff:

> given the seriousness of OCI issues uncovered by my investigation involving multiple offerors (which determined that CTSS IV award to Trace is tainted by an appearance of an OCI), the numerous issues identified with CTSS IV RFP's evaluation criteria and the change in the requirements, I determined that it is in the best interests of the Government to terminate the CTSS IV award to Trace for the Government's convenience, to cancel the CTSS IV RFP, and to reprocure the CTSS requirement. I also determined that it is in the best interest of the Government to transfer the competition of the CTSS requirements to AFCENT and AMIC.

AR 23400.  Plaintiff argues that the agency's decision to cancel the CTSS IV RFP was "arbitrary, capricious, and not supported by the record."  *See generally* ECF No. 91 ("Pl.'s MJAR").  The Court disagrees.

### a.  It was reasonable for the agency to conclude that there was an appearance of OCI

Cases before this Court and GAO have interpreted FAR subpart 9.5 as identifying three categories of OCIs: biased ground rules, unequal access to information, and impaired objectivity. *See, e.g.*, *L-3 Commc'ns. Corp. v. United States*, 99 Fed. Cl. 283, 297 (2011) ("Generally, there are three types of OCIs—resulting from unequal access to information, biased ground rules, and impaired objectivity."); *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 568 (2010) (citations omitted) ("Cases before the Court of Federal Claims and bid protests before the GAO have interpreted FAR Subpart 9.5 to identify three distinct types of OCIs."), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011).  The contracting officer identified potential unequal access to information OCIs for the CTSS IV procurement.  An unequal access to information OCI occurs when, as part of its performance of a government contract, an offeror has access to non-public information (including proprietary information and non-public source selection sensitive information) that may provide the offeror with a competitive advantage in a competition for a different government contract.  48 C.F.R. §§ 9.505(b), 9.505-4; AR 23381.  The FAR "requires agencies

---

[1] To the extent that the August 31, 2022, cancellation memorandum does not constitute new agency action, Plaintiff failed to raise such an argument in its third amended complaint or in its motion for judgment on the administrative record.

to avoid conflicts of interest in the procurement process, including those based upon an offeror's unequal access to information that 'is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract.'" *VSolvit, LLC v. United States*, 151 Fed. Cl. 678, 689 (2020) (quoting FAR § 9.505(b)). In determining whether an unequal access to information OCI exists, "[t]he mere existence of a prior or current contractual relationship between a contracting agency and a firm does not create an unfair competitive advantage." *PAI Corp. v. United States*, 614 F.3d 1347, 1353 (Fed. Cir. 2010) (citing *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 203 (2007)). Instead, the identification of an OCI must be based on "hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough." *Turner Constr. Co.*, 645 F.3d at 1387 (citing *PAI Corp.*, 614 F.3d at 1352). However, "hard facts do not need to show an actual conflict—a potential conflict can be sufficient." *Id.* (internal quotations omitted).

Here, as part of the agency's corrective action, the contracting officer conducted multiple investigations into the OCI allegations raised in the GAO protests and this protest, including OCI allegations involving Plaintiff, Salient, and a former GDIT employee. Her investigation revealed that (1) there was an appearance of an OCI involving John DeBerry at Plaintiff and ███ ███████ at Salient; (2) there was no OCI involving Steve Dawson, a former GDIT employee; (3) there was no PIA violation involving Mr. Dawson; and (4) there appeared to be a violation of 5 CFR § 2635.502 involving Mr. Dawson. AR 23381. The contracting officer concluded that "[t]hese findings ma[d]e it clear that the CTSS IV solicitation did not meaningfully address potential OCI issues, particularly in light of the fact that personnel move between AFCENT and government contractors fairly regularly." AR 23390–91. As a result, the contracting officer concluded that there was a reasonable appearance of OCIs in the CTSS IV procurement. Plaintiff has failed to show that this conclusion was irrational.

> i.   *It was rational for the contracting officer to conclude that there was an appearance of OCI regarding John DeBerry's involvement in the preparation of Plaintiff's proposal*

Plaintiff argues that the agency's determination that Plaintiff has an appearance of an OCI is arbitrary and capricious because it is not supported by "hard facts," but rather "relies upon innuendo built upon suspicion and buttressed by faulty assumptions." Pl.'s MJAR at 9, 11. The agency "determined that there is an appearance of an unequal access to information OCI involving Trace, due to its decision to employ Mr. DeBerry and utilize him in the preparation of their proposal in response to the CTSS IV RFP." AR 23382. Plaintiff asserts, however, that in making this determination the agency failed to identify and assess what sensitive information Mr. DeBerry had at the time of his proposal assistance for CTSS IV, what assistance Mr. DeBerry gave to Plaintiff for its proposal for CTSS IV, and whether the information Mr. DeBerry had was competitively useful to Plaintiff in its CTSS IV proposal. Pl.'s MJAR at 11–21. The Court disagrees with Plaintiff's assertions.

During the corrective action, the contracting officer interviewed several former and current AFCENT A6 personnel, reviewed the contract files for CTSS III (contract and bridge contract) and CTSS IV, reviewed the final proposal submitted by Plaintiff on May 19, 2021, and reviewed Plaintiff's response to OCI ENs issued after the GAO protests were dismissed.

14

AR 23382.  Based on this review, the contracting officer determined that Plaintiff's use of Mr. DeBerry in preparing its proposal created the appearance of an unequal access to information OCI.  *Id.*  This determination was reasonable for several reasons.

First, as a general matter, Mr. DeBerry played a very significant role at AFCENT as the Division Chief of AFCENT A6X from April 1999 until April 2018:

> As the A6X Division Chief, Mr. DeBerry was involved in planning deployment of Air Force Tactical Communications in theater.  He would have been responsible for reviewing and approval of technical solutions for theater requirements.  He oversaw the development and acquisition of some contract services to support theater requirements and day-to-day operations.

AR 23314.

In addition, and more importantly, Mr. DeBerry was heavily involved in the supervision of CTSS III.  He served as an advisor and as the "requirements owner" for CTSS III and "supervised the day-to-day operations of the CTSS III contract."  AR 23295, 23314.  In this role, Mr. DeBerry "received briefings on the [CTSS III] procurement, and a high-level summary of estimated costs on individual task orders."  AR 23328.  He attended semi-annual CTSS III Program Management Reviews.  AR 23329.  "These reviews consisted of discussions on the status of tasks orders issued and GDIT's overall performance.  These briefings would also include information on GDIT's proposed rates, summary of prices on task order issued and review of any proposed contract changes."  *Id.*  Although it was not likely, nor typical, for someone in Mr. DeBerry's position to receive information on rate build up, individual labor rates, or "the actual cost proposal," labor rates were a "topic of discussion for CTSS III because this contributed to the staffing issues."  AR 23328–29, 23482.  Therefore, Mr. DeBerry "could have been part of conversations where individual labor rates were discussed."  AR 23329.  Additionally, "[b]ased on Mr. DeBerry's role, he had access to the CTSS III contractor's (GDIT) provided cost estimates for projects or contract modifications for projects and would have used these to recommend whether to proceed with efforts based on cost versus benefit to the mission."  AR 23314.

Moreover, as the requirements owner for CTSS III, Mr. DeBerry was also "briefed on the total cost or estimated cost for changes in the level of effort for budgeting purposes" for CTSS III and "[h]e would provide his approval for the total cost changes to task orders (for example, if there was a level of effort increase or decrease) as he oversaw the total budget for the branch."  AR 23482.  He "responded to identified problem areas in [CTSS III] execution and advised Expeditionary Communication Squadron (ECS) Commanders on [CTSS III] scope and breadth."  AR 23314.  Additionally, he "recommended to the A6 Director CTSS Contract areas for modification" and "had access to the CTSS III contractor's (GDIT) provided cost estimates for projects or contract modifications for projects and would have used these to recommend whether to proceed with efforts based on cost versus benefit to the mission."  AR 23467.

Furthermore, in 2017, there were program management review meetings to determine the way forward on the CTSS procurement.  AR 23314.  "Mr. DeBerry was present at these

meetings and provided his advice on the possible course of actions." *Id.* This included a meeting during which "all parties discussed the need to improve CTSS III performance, specifically GDIT's proposed labor fill rates and it was recommended that DISA would issue CTSS IV and the contract would be competed early." AR 23329.

Contrary to Plaintiff's assertions, Mr. DeBerry's announcement in April 2017 that he planned to retire from AFCENT in April 2018 does not make the contracting officer's determination regarding the appearance of an OCI irrational. *See* AR 23467. The planning process for CTSS IV began in December 2017. AR 23315. Although there is nothing in the record to suggest that Mr. DeBerry worked on the CTSS IV procurement itself, attended any CTSS IV planning meetings, or received any documentation related to CTSS IV, *see* AR 22314–15, 23330, he did work on the preliminary CTSS IV procurement planning and "was in a general environment where [] discussions about CTSS IV were occurring." AR 23315. Additionally, during the period between the announcement of his retirement and his retirement, Mr. DeBerry "retained his regular duties related to the CTSS III contract." AR 23467.

In June 2019, after Mr. DeBerry retired from AFCENT, he joined Plaintiff as a special projects account manager. AR 22495. According to Plaintiff's EN, Mr. DeBerry reviewed multiple draft volumes of Plaintiff's proposal in response to CTSS IV, including "Volume 1 Executive Summary, Volume 2 Past Performance, Volume 3 Technical, and Volume 6 Contract Documentation," and "assess[ed] Trace's responsiveness to the Government's requirements." AR 22496. "Although the contracting approach for CTSS IV is different from CTSS III, the basic requirement for technical contract support for theater communication remained similar." AR 23315. Because of this, "it is not unreasonable to conclude that non-public, proprietary, and/or competitively useful knowledge and information obtained on CTSS III will most likely benefit any offeror in preparation of their proposal on CTSS IV." AR 23308. Thus, it was reasonable for the contracting officer to find an appearance of OCI when Plaintiff utilized Mr. DeBerry, "the Division Chief of AFCENT A6X Division that oversaw the performance of CTSS III contract where GDIT is the prime vendor," and "an individual with knowledge of non-public, proprietary, and competitively useful information, in preparation of the proposal submitted in response to the RFP" for CTSS IV. AR 23383.

Despite the above facts relating to the appearance of an OCI regarding Mr. DeBerry's involvement in the preparation of Plaintiff's proposal, Plaintiff argues that the contracting officer's OCI determination concerning Mr. DeBerry was unreasonable because it was not supported by "hard facts." According to Plaintiff, the contracting officer "failed to identify what – if any –specific sensitive information gave rise to an OCI; what details – if any – DeBerry still possessed at the time of his proposal assistance; what contributions DeBerry made to the Trace proposal; and whether any information DeBerry possessed was competitively useful to Trace in its 2021 proposal effort." ECF No. 101 at 18 ("Pl.'s Resp."). However, the information relied upon by the contracting officer, which is partially discussed above, constituted "hard facts" sufficient to support a finding that the appearance of, or the potential for, an OCI existed.

As the Federal Circuit observed in *Turner Construction*, while the identification of "an OCI must be based on hard facts. . .[,] hard facts do not need to show an actual conflict—a potential conflict can be sufficient." 645 F.3d at 1387 (internal quotations omitted). Here, the

hard facts demonstrate that it was reasonable for the agency to conclude that the appearance or potential for an OCI was present. Unlike *Turner Construction*, in which the Federal Circuit held that "possible" access to "unidentified information" by "some unnamed . . . employees" was not enough to establish "hard facts" of a potential or actual OCI, *see id.*, here, the contracting officer identified specific information that Mr. DeBerry possessed and explained why that information was non-public and competitively useful for the CTSS IV contract. The contracting officer found that Mr. DeBerry supervised the day-to-day operations of the CTSS III contract, knew the GDIT proposed rates and cost estimates for projects, was briefed weekly on CTSS III changes, and was involved in GDIT staffing and labor rate discussions. *See* AR 23383–84. The contracting officer also found that CTSS IV had similar requirements as CTSS III, making Mr. DeBerry's knowledge of CTSS III competitively useful in Plaintiff's proposal for CTSS IV. *See id.* The contracting officer also found, and Trace admitted in its EN, that Mr. DeBerry reviewed multiple drafts of Trace's CTSS IV proposal. AR 22496. These are hard facts that support a reasonable conclusion that an appearance of OCI existed regarding Plaintiff's use of Mr. DeBerry in preparing its proposal.

Put simply, Mr. DeBerry was the architect of CTSS III for years and was its requirements owner. To quote counsel for GDIT, "he was essentially the godfather of CTSS III." ECF No. 109 ("Arg. Transcript") at 75:22. He possessed non-public and competitively useful information regarding CTSS III. He was still the A6X Division Chief when preliminary plans for CTSS IV began. He then retired from AFCENT, joined Plaintiff two years later, and assisted Plaintiff with its CTSS IV proposal, which was initially successful. CTSS III and CTSS IV have many similar requirements. When the Court connects these dots, it is easy for it to conclude that the agency's finding an *appearance* of an OCI here was completely reasonable.

> ii.    *Plaintiff has waived any argument regarding the agency's actions related to OCIs involving Salient or Steve Dawson*

As part of the agency's OCI investigation, the contracting officer also examined OCI issues related to former AFCENT employee ███████████ involvement in Salient's CTSS IV proposal and former GDIT employee Steve Dawson's involvement in the decision to cancel the CTSS IV procurement and the award of the CTSS III bridge contract. The contracting officer interviewed ████████ and Mr. Dawson, reviewed both Salient's and GDIT's final proposals for CTSS IV, and reviewed GDIT's proposal for the CTSS III bridge contract. AR 23384, 23386. She determined that there was an appearance of an unequal access to information OCI involving Salient's decision to utilize ██████ in connection with its CTSS IV proposal. AR 23385. She also determined that while there was no OCI involving Mr. Dawson, and his approval of the J&A in April 2022, which extended the CTSS III bridge contract to GDIT within twelve months of leaving GDIT's employment, constituted a violation of 5 C.F.R. § 2635.502. AR 23390. These two determinations contributed to the contracting officer's recommendation that the agency cancel the CTSS IV award to Plaintiff and recompete the CTSS IV procurement because it had not been adequately safeguarded from potential ethical and OCI issues. AR 23390–91.

Despite these findings, which in part led to the agency's determination to cancel the CTSS IV procurement, Plaintiff does not address the OCI issues related to Salient and the ethical

issues related to Mr. Dawson identified by the contracting officer in its motion for judgment on the administrative record.[2]  In fact, "Salient" only appears once in Plaintiff's sixty-three page-long MJAR brief and, even then, only in a footnote complaining that the OCI investigations into Salient and Plaintiff were not equal.  *See* Pl.'s MJAR at 17 n.5.  Plaintiff even admits in its response that its "MJAR does not address the Contracting Officer's determination regarding Salient."  Pl.'s Resp. at 15.  Unfortunately for Plaintiff, this constitutes a waiver of any argument regarding the unreasonableness of the agency's determination that Salient's OCI issues supported cancellation of the solicitation.  *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

Because the road not taken looks really good now, Plaintiff attempts, in its response, to justify its failure to "address the Contracting Officer's determination regarding Salient" by arguing that an OCI issue related to an unsuccessful offeror "has no bearing on whether the solicitation meets the agency's needs if – as is the case here – there is no basis to conclude that the successful offeror's award was tainted by an OCI."  Pl.'s Resp. at 15 (emphasis omitted).  The problem with Plaintiff's argument is one that repeatedly infects its briefing in this matter: it continually ignores the fact that the agency plainly stated that "[i]f it is determined that the RFP no longer meets the Agency's needs, the Agency will cancel the RFP."  AR 21672.  And that is what the agency determined: that the RFP no longer met its needs.  One of the reasons the RFP no longer met its needs was because the contracting officer's OCI investigation "revealed OCI issues surrounding CTSS IV acquisition involving multiple offerors."  AR 23390.  However, rather than address the actual OCI-related reasons that contributed to the procurement's cancellation by attempting to show that the agency's determinations related to Salient and Mr. Dawson were irrational, Plaintiff chose to ignore what the agency actually did, recast the agency action in Plaintiff's own terms, and then attempt to show that this non-existent agency action was unreasonable.  But, in so doing, Plaintiff waived any argument that the agency's determinations with regard to Salient and Dawson were irrational.

Moreover, to the extent that Plaintiff did address the OCI and ethical issues related to Salient and Mr. Dawson that were identified by the agency, Plaintiff is simply incorrect that the agency decided "to terminate Trace's award on the purported OCIs of other offerors."  Pl.'s Resp. at 13.  Plaintiff argues that "it was arbitrary and capricious for the Agency to base its decision to terminate Trace's award on the purported OCIs of other offerors where Trace had no control or even knowledge of other offerors['] proposals," because there is no case law supporting "the proposition that OCI or other ethical concerns with respect to unsuccessful offerors may serve as a rational basis for an agency's corrective action termination of an awarded contract and cancellation of the related solicitation."  *Id.*  Plaintiff asserts that "even setting aside the corrective action aspect of this protest, neither the Government nor GDIT cites a single case – and Trace is unaware of one – standing for the proposition that a contract may be terminated after award based upon OCIs (or UCAs or other ethical concerns) with respect to unsuccessful offerors."  *Id.*  Plaintiff's argument misses the mark.

---

[2] Plaintiff does address ethical issues related to Mr. Dawson in its motion for judgment on the administrative record but does so in the context of its bad faith argument, not in connection with the agency's determination that ethical issues related to Mr. Dawson supported cancelling the CTSS IV procurement.  Pl.'s MJAR at 65–70.

First, the agency did not terminate Trace's contract because other unsuccessful offerors had an OCI, or even the potential of an OCI. Rather, the agency determined that the CTSS IV procurement itself was flawed because, among other things, the "CTSS IV solicitation did not meaningfully address potential OCI issues." AR 23390. Because the procurement as a whole was threatened by the failure to include safeguards for OCIs and other ethical violations, the agency reasonably decided to cancel the solicitation and re-solicit the contract.

Second, Plaintiff never challenged the agency's decision to take corrective action. Part of the corrective action included a "review" of "the offerors' Organizational Conflict of Interest statements and mitigation plans." AR 21671. It also generally included a review of whether the solicitation continued to "meet[] the Agency's needs." AR 21672. Thus, the OCI investigation the agency conducted was part of the corrective action. Having failed to challenge the agency's decision to take corrective action, Plaintiff cannot now argue that the agency's decision to investigate unsuccessful offerors for potential OCI concerns (and then use the results of those investigations as reason to cancel the RFP) was irrational. Plaintiff waived that argument when it failed to challenge the agency's decision to take corrective action in the first place. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."); *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012) (applying the waiver rule to the challenge of a solicitation amendment issued two and a half months prior to contract award, providing "more than an adequate opportunity to object"). But Plaintiff should have thought twice before it let it all go. Plaintiff was aware of both the agency's intent to investigate possible OCI issues and the risk that the CTSS IV RFP could be cancelled if it no longer met the agency's needs. And yet Plaintiff still failed to challenge the corrective action as unreasonable. Therefore, any argument that examining OCI-related issues as part of the corrective action was in error is waived.[3]

### iii. *Overall, based on the reasons above, it was reasonable for the contracting officer to conclude that there was an appearance of OCI*

In considering the OCI concerns regarding Mr. DeBerry and ████████, and the ethical violations regarding Mr. Dawson, the Court finds that, on the whole, the agency's determination that CTSS IV procurement was not adequately safeguarded from potential OCI issues and that the solicitation needed to be redone with better safeguards was reasonable. While the contracting officer did not find an actual OCI, she did identify two different employees from two different offerors whose involvement in preparing proposals in response to the CTSS IV RFP created the appearance of an OCI, as well the fact that the involvement of a former employee of another offeror created ethical violations that impacted the CTSS IV procurement. Moreover, as explained above, the contracting officer's finding of an appearance of an OCI was based on hard facts. When taking all of this together, the Court finds that it was reasonable for the contracting

---

[3] This is not to say that Plaintiff could not have challenged the rationality of the OCI investigation that was actually conducted (in fact, Plaintiff did just that with regard to the OCI identified with regard to its own proposal). However, as discussed above, Plaintiff cannot protest the fact that an OCI investigation, including into Salient, was conducted in the first place.

officer to conclude that an appearance of OCI existed and that the CTSS IV procurement should be cancelled and resolicited with better safeguards.

### b. It was reasonable for the contracting officer to conclude that the evaluation criteria were redundant

In the agency's August 31, 2022, cancellation memorandum, the contracting officer "noted that some of the evaluation criteria in CTSS IV RFP were redundant and unclear in certain critical areas." AR 23391. She reached this conclusion after reviewing "the GAO protest allegations and the evaluation criteria under the Technical/Management Factor in the CTSS IV RFP." *Id.* This review led her to determine that the evaluation criteria under the Technical/Management Factor "were redundant and unclear" and that the redundant criteria "would result in artificially increasing the value of the proposed solutions." *Id.* As a result, she determined "that the Government's evaluation criteria in CTSS IV RFP need[ed] to be updated to allow for streamlining of the requirements." *Id.* Therefore, she concluded that "given the fact that the CTSS IV procurement appeared to have suffered from OCI issues involving multiple offerors . . . including OCI as part of the evaluation criteria w[ould] best serve the needs of the Government." *Id.*

Plaintiff argues that "[t]he Government's determination regarding redundant evaluation criteria is both arbitrary and capricious and has no basis within the certified record." *See* Pl.'s MJAR at 26–37. Plaintiff asserts that "[t]he CO fails to establish how these subfactors supposedly overlap or why it impacts evaluation or award when not a single contractor filed a pre-award protest regarding these alleged redundancies . . . ." *Id.* at 28 (emphasis omitted). Plaintiff then argues that "the Solicitation demonstrates that no such redundancies exist." *Id.*

To begin, the evaluation subfactors under the Technical/Management Factor were as follows:

Subfactor 1. Program Management Plan:

(a) Demonstrates a logical and appropriate overarching Corporate Structure, Indefinite Delivery/Indefinite Quantity (IDIQ) Program Management and Task Order (TO) management strategy, to include management and control of subcontractors, to ensure successful contract performance.

(b) Details the proposed organizational structure, functional alignments, key positions/personnel, lines of communication/authority, and processes to ensure quality, security and other functions key to successful contract performance.

Subfactor 2. Staffing and Retention:

(a) Demonstrates a logical and appropriate approach to recruit, on-board, and retain fully qualified personnel at all performance locations for the life of the IDIQ.

(b) Displays detailed explanation of compensation and/or benefits packages and any other incentives to minimize turnover and retain qualified personnel.

(c) Details strategy and processes effectively to manage vacancies, ensure continuity of operations, and mitigate disruption of services during personnel absences or turnover (e.g., sickness, leave, or voluntary/involuntary termination).

Subfactor 3. Deployment and Mobilization:

Demonstrates a clear understanding of Outside the Continental United States (OCONUS) deployment/travel processes and requirements, and capability to deploy personnel to/from locations in Southwest Asia (including designated war/combat zone locations) effectively for the life of the IDIQ.

Subfactor 4. Transition-In Plan:

(a) Demonstrates an executable 90-day CTSS IV and Task Order-0001 Transition-In Plan. Details the offeror's processes and procedures necessary to provide continuity of mission support and contract performance from contract award through performance start to ensure no disruption of service. Exhibits a logical and appropriate:

1. Phased approach for transitioning in the contractor's corporate structure, overarching program management, overarching quality management, and workforce;

2. Timeline to ensure workforce is trained, certified, and qualified to assume all SOW tasks and responsibilities from the incumbent by full performance start;

3. Processes and procedures necessary to mobilize the workforce to all locations specified in the SOW; and

4. Time Phased Labor Matrix phase-in plan.

(b) Addresses transitioning/phase-in risks and provide appropriate handling strategies. Details any assumptions the Offeror has regarding roles and responsibilities of the incumbent contractor, and information the Offeror requires from the incumbent contractor.

AR 23392–93 (internal citations omitted). According to the contracting officer, the overlap in subfactors 1 and 2 created issues in assessing "whether an offeror should receive one strength for Subfactor 1 for their organizational structure, key personnel, and process to ensure successful performance, and one strength for Subfactor 2 for their staffing strategies, or should the offeror receive a total of one strength for these overlapping aspects of an offeror's proposal under either Subfactor." AR 23394. The overlap in subfactors 2 and 3 created issues in assessing "whether

an offeror should receive one strength for Subfactor 2 for their ability to recruit and on-board personnel and one strength for Subfactor 3 for the mobilization plan or should the offeror receive a total of one strength for these overlapping aspects of an offeror's proposal under either Subfactor." *Id.* Finally, the similarities in subfactors 3 and 4 created issues in assessing "whether an offeror should receive one strength for Subfactor 3 for their mobilization plan and one strength for Subfactor 4 for the same mobilization plan or should the offeror receive a total of one strength for their mobilization plan under either Subfactor." *Id.*

Although the Court, lacking the technical knowledge of the contracting officer, does not necessarily find redundancy, it is not the Court's place to substitute its view for that of the contracting officer and make its own decision as to whether the criteria are redundant. Rather, the Court must decide whether the contracting officer's decision regarding redundancy was rational. In making this determination, the Court must recognize that "contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," and that the "court should not substitute its judgment for that of a procuring agency." *SigNet Techs., Inc. v. United States*, 154 Fed. Cl. 396, 408 (2021) (internal quotations and citations omitted). In short, the Court "is highly deferential" to the contracting officer. *See Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Therefore, if there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). In other words, the Court "will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974).

Here, while the Court may not initially see redundancies in the criteria, it will defer to the expertise of the contracting officer rather than replace the contracting officer's judgment with its own. Moreover, rather than establishing unreasonableness on the contracting officer's part, Plaintiff simply substitutes its read of why no redundancies exist for the contracting officer's read of why they do. But just as the Court will not substitute its view for that of the contracting officer, it will likewise not adopt Plaintiff's view in place of the contracting officer's absent a showing of unreasonableness. In short, more than second-guessing is needed to carry Plaintiff's burden to show irrationality on the part of the agency. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]he minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement . . . involve discretionary determinations of procurement officials that a court will not second guess."). Accordingly, the Court finds that the contracting officer's analysis of the evaluation criteria was reasonable and is supported by the record.

### c.  It was reasonable for the agency to conclude that its requirements for CTSS IV had sufficiently changed to warrant cancellation of the solicitation

Between December 2021 and February 2022, the contracting officer and AFCENT's program office "identified multiple changes in the requirements expressed in the SOW for the CTSS IV RFP . . . ." AR 23395. "The changes in the requirements were the result of the real

22

world events impacting the fluid needs of CTSS IV information technology requirements within AFCENT's SWA AOR."  AR 23395–96.  The contracting officer compared the requirements of CTSS IV to those of CTSS V, which AMIC was drafting at the time.  AR 23395.  After review, the contracting officer concluded that the "RFP that was released in June 2020 no longer accurately reflect[ed] the needs of the Government."  AR 23396.  As a result, the agency determined that it was in the best interests of the agency to cancel and recompete the procurement.  AR 23399.

The changes in the agency's requirements as identified by the contracting officer are as follows:

> 1. Satellite Communications (SATCOM) Operations and Control Center Functions . . .
>
> CTSS IV contained the following requirement as part of its IDIQ SOW: . . .
>
> The contractor shall provide OCC support at the Government facility located at Shaw AFB and as directed by U.S. AFCENT A6.  The contractor shall maintain continuous operations of the OCC 24/7/365 (around-the-clock).  The OCC is responsible for remote transponder spectrum monitoring, terminal monitor and control, terminal performance monitoring activities, hazardous condition (HAZCON) reporting and resolution, and terminal maintenance status.  The contractor shall have operational control of the deployed terminal operations IAW applicable directives or instructions.
>
> The CTSS V draft SOW, however, eliminated the requirement for SATCOM OCC Functions ("OCC") . . . .
>
> * * *
>
> 2. New Network Operations Requirements . . .
>
> CTSS IV RFP did not contain a requirement for the Network Operations.  However, CTSS V included a new requirement as part of its IDIQ SOW . . . .  [T]he new requirements added to CTSS V draft SOW [were]:
>
> (i) Install and maintain network wireless equipment to support new and emerging requirements.
> (ii) Use AFCENT provided wireless network devices for routing and switching
> (iii) Provide responsive services to include real-time network-level configuration control, network restoration, quality control and performance standards.
> (iv) Provide a heat map for the area support by USAFCENT wireless . . . .
>
> * * *

[3]. Afghanistan . . .

> The SOW for the CTSS IV RFP IDIQ required offerors to provide support in Afghanistan during the life of the contract.  This requirement was transferred over from CTSS III to CTSS IV RFP.  In fact, in 2021, approximately 30 Full-Time Equivalents (FTEs) provided support under CTSS III in Afghanistan.  However, on August 30, 2021, United States removed all armed forces from Afghanistan, thus eliminating the need for the provision of support in that country.

> The CTSS V draft SOW removed the requirement for the provision of support in Afghanistan.

[4]. Key Personnel Vacancy Differences Between CTSS IV and V . . .

> CTSS IV RFP contained different requirements for the replacement of key personnel. For example, the IDIQ SOW advised offerors that a winning vendor can be subject to disincentives of up to 50 percent of their total proposed fixed fee if the staffing levels fall below percentages identified within each TO.  Moreover, under TO 0001, a winning offeror was required to fill a key personnel vacancy within 45 calendar days.

> The CTSS V draft SOW removed any disincentives and instead advised offerors that key personnel vacancies now should be filled within 25 calendar days in Continental United States (CONUS), and 45 calendar days in OCONUS . . . .

* * *

[5]. SATCOM/Wide Area Network (WAN)/Microwave Support . . .

> [A] winning offeror under CTSS IV RFP would be required to provide WAN support from the award day, but not SATCOM or Microwave support.  Instead, the winning offeror would have to ensure that it was capable of providing SATCOM and Microwave support during the life of the CTSS IV contract.

> [However,] [t]he CTSS V draft SOW . . . require[s] the winning offeror to provide SATCOM/WAN/Microwave support almost immediately.

AR 23396–98 (internal quotations omitted).

Although Plaintiff does not dispute that the above five changes were, in fact, changes from the CTSS IV RFP, Plaintiff asserts that the changes were not significant enough to warrant cancellation of the solicitation.  Rather, according to Plaintiff, all of the changes cited by the agency could have been accomplished through task orders under an awarded CTSS IV contract; therefore, the contracting officer's decision that the changes warranted cancellation of the solicitation was irrational.  *See* Pl.'s MJAR at 38 (asserting that the changes are "easily and

24

routinely addressed through the issuance of (or decision not to issue) task orders related to those needs").

As the Court explained earlier, the agency informed Plaintiff that it was taking corrective action, and that part of the corrective action could include "cancel[ing] the RFP" if it was "determined that the RFP no longer me[t] the Agency's needs." AR 21672. After review, the agency discovered that it had new needs and thus had different requirements for its CTSS contract.[4] The agency wanted to account for those new needs with a new CTSS RFP rather than through task order changes to the contract that would have resulted from the CTSS IV RFP. The Court finds the course of action chosen by the agency to be rational. Although it is possible that these changes could have been accomplished through change orders, there is nothing irrational in the agency's decision to accomplish these changes through cancellation and re-solicitation, especially given the other issues with the CTSS IV procurement discussed above.

While by themselves, any one of the above changes may appear insignificant, Plaintiff has failed to demonstrate any irrationality in the agency's determination that, when combined, "the changes . . . demonstrate that the CTSS IV RFP did not portray Government requirements in an accurate manner." AR 23399. According to the contracting officer, a new RFP with updated requirements "will ensure that the offeror's proposed costs are as realistic as possible in determining the Government's most probable cost" and "will allow the Government to have a contract that serves their adjusted requirements." *Id*. This is a rational determination. Accomplishing these changes through task orders would require the successful offeror to meet new requirements that were not in its original proposal and would likely affect that offeror's estimated costs. *See* AR 23399. Accordingly, the Court finds that it was reasonable for the contracting officer to decide that these changes were significant enough to cancel and re-solicit the contract in order to better meet the agency's changed needs.

> ### d. It was reasonable for the contracting officer to make a holistic decision to cancel CTSS IV based on the combination of the three factors described above

The contracting officer made it clear that

> given the seriousness of OCI issues uncovered by [her] investigation involving multiple offerors (which determined that [the] CTSS IV award to Trace is tainted by an appearance of an OCI), the numerous issues identified with CTSS IV RFP's evaluation criteria[,] and the change in the requirements, [she] determined that it [was] in the best interests of the Government to terminate the CTSS IV award to Trace for the Government's convenience, to cancel the CTSS IV RFP, and to reprocure the CTSS requirement.

---

[4] AMIC was already drafting CTSS V when the contracting officer began evaluating CTSS IV. *See* Arg. Transcript at 123:15–25. In her discussions with AMIC, the contracting officer realized that the original requirements of CTSS IV would no longer meet the agency's needs based on the requirements AMIC was drafting into CTSS V. *See id.*

AR 23400.  Although some factors might have merited cancellation in and of themselves, the agency specifically determined that "the cumulative effect" of the OCI issues, redundant evaluation criteria, and changes in requirements required "fundamental changes to the solicitation and require[d] offerors to update and resubmit their solutions."  AR 23399.

Accordingly, even if one of the factors alone was insufficient to support the cancellation of the CTSS IV procurement, the real test is whether the factors in combination rationally support such an agency action.  Plaintiff failed to prove that either in isolation, or in combination, the agency's actions here were unreasonable.  In examining the agency's actions, the Court finds that cancelling the CTSS IV RFP was a reasonable action supported by the administrative record.  The Plaintiff simply did not demonstrate that it was irrational for the agency to conclude that "it is not in the best interests of the Government to issue an amendment to the CTSS IV RFP and fix the above changes in the requirements, along with the OCI issues, and the issues in the evaluation criteria of CTSS IV RFP described above" because it would "require fundamental changes to the solicitation and require offerors to update and resubmit their solutions."  AR 23399.  As discussed above, the contracting officer identified multiple issues with the CTSS IV RFP.  She even identified multiple issues within those issues.  Given these numerous issues, it was reasonable for the agency to conclude that "[t]he evaluation of the updated solutions will most likely take just as much time, if not longer, when compared to cancelling the CTSS IV RFP, terminating CTSS IV award to Trace, and transferring the reprocurement of CTSS requirement back to AMIC."  *Id.*

### 2.    Plaintiff has not Established that it has Standing to Challenge the Award of the Sole-Source Bridge Contract to GDIT

In addition to challenging the cancellation of the CTSS IV procurement, Plaintiff separately protests the agency's award of a sole-source bridge contract to GDIT to continue providing communications technical support services under CTSS III while the agency's requirements are competitively recompeted.  Although Plaintiff offers several arguments as to why the sole-source award to GDIT was in error, Plaintiff failed to first establish that it has standing to challenge the award to GDIT.  However, "[i]t is well-established that the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence."  *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013).

In bid protests, "[o]nly an 'interested party' has standing to challenge a contract award."  *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)); 28 U.S.C. § 1491(b).  This means that in bid protests, standing "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  Accordingly, Plaintiff must prove two elements to establish that it has standing: (1) that it is an actual or prospective offeror, and (2) that it possesses a direct economic interest in the award of the contract.  *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015).  In terms of the second prong—the prong on which the Court will focus in explaining Plaintiff's failure to meet its burden—in order to prove a direct economic interest, a protestor must demonstrate prejudice.  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d

1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing."). Because the protest of the GDIT sole-source bridge contract is post-award, to establish prejudice, Plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract." (citations omitted)).  Stated differently, to demonstrate that it had standing, Plaintiff needed to "establish that it could compete for the contract if the bid process were made competitive." *Myers*, 275 F.3d at 1370 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001)) (internal quotations omitted).  It is this burden Plaintiff has failed to establish.

In fact, as explained below, Plaintiff does not even attempt to meet this burden, either with: (1) jurisdictional allegations in its complaint; or (2) in response to GDIT's challenge to Plaintiff's standing, with any evidence that Plaintiff was capable of performing the necessary CTSS services in the timeframe and manner called for by the bridge contract.  *See Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) ("If the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, however, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction.  In such a case, the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion." (citation omitted)).  Although not dispositive of this issue, it is rather telling that in Plaintiff's motion for judgment on the administrative record, it skips right over the standard required to demonstrate standing to challenge the sole-source award and heads directly into focusing on what must be demonstrated on the merits to be successful in challenging a sole-source award.  *See* Pl.'s MJAR at 54 (quoting *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001), for the proposition that "a sole-source procurement decision may be set aside if: '(1) the sole-source award lacked a rational basis; or (2) the sole-source procurement procedure involved a violation of a statute, regulation, or procedure'")).  Plaintiff's reliance on *Emery Worldwide* for the standard on the merits for setting a sole-source award aside is properly placed, but "the question of standing . . . must be reached before addressing the merits . . . ." *Info. Tech. & Applications*, 316 F.3d at 1319; *see also Reoforce, Inc. v. United States*, 853 F.3d 1249, 1264 (Fed. Cir. 2017) ("Standing is 'a threshold inquiry that in no way depends on the merits of the case.'" (quoting *Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp*., 510 U.S. 27, 31 (1993) (per curiam))).

Before addressing Plaintiff's failure to establish standing, it is important to recall the timing and requirements for the sole-source bridge contract.  The sole-source contract was awarded on March 28, 2022, nearly seven months after the award of the CTSS IV contract to Plaintiff, and it required the provision of CTSS services beginning on June 10, 2022.  According to the agency, the timeframe between contract award and commencement did not leave adequate time for transition between the incumbent contractor, GDIT, and a new contractor.  AR 23181 ("[A]ccording to Government estimates, it would require approximately six months for Trace to replace GDIT's existing workforce and complete the necessary transition.").  Given these constraints, the agency concluded that GDIT was the only responsible source and there was an urgent and compelling need to sole-source the bridge to GDIT:

> Due to the termination for convenience of CTSS IV, . . . the incumbent contractor (GDIT) under CTSS III, who is already in place in SWA with a workforce of ▆▆ full time equivalent employees, is the only source that can immediately and completely fulfill this requirement ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

AR 23184.

Regardless of whether the agency's rationale for awarding a sole-source bridge was rational, Plaintiff does not and cannot challenge the fact that CTSS services were needed on June 10, 2022, in order to avoid "mission critical failure." *See id.* With that in mind, it was jurisdictionally critical for Plaintiff to allege and, once challenged by GDIT, prove, that it could provide CTSS services required by the bridge contract beginning on June 10, 2022, in order to have standing to challenge the agency's decision to award the bridge contract on a sole-source basis. *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1360 (Fed. Cir. 2018) ("[The protestor] lacks standing because it failed to demonstrate an ability to perform specific requirements that are set forth in the administrative record."). Plaintiff falls short of meeting this burden.

At best, the third amended complaint makes two conclusory allegations that relate to this jurisdictional burden:

- "Trace was the awardee of this work. It therefore would be a qualified bidder with a substantial chance of award of the CTSS J&A-3 Bridge Contract had the Agency engaged in a competitive procurement for the contract at issue." ECF No. 88 ¶ 11.

- "The Agency's decision to award a sole source contract to GDIT is arbitrary, capricious, and violates applicable law because there are other responsible sources, including Trace who had literally been awarded the follow-on contract before it was improperly terminated, capable of satisfying the Agency's requirements." *Id.* ¶ 114

Neither of these allegations, however, directly address the key jurisdictional question: could Plaintiff, with only a little more than seventy days between award and commencement of CTSS bridge contract work on June 10, 2022, have performed the required services "without mission critical failure and risk of a substantial break in service and support to AFCENT?" *See* AR 23184. The complaint likely does not make the key allegation because, as is estimated in the J&A, "it would require approximately six months for Trace to replace GDIT's existing workforce and complete the necessary transition." AR 23181.

It is not enough for Plaintiff to allege that because it "was the awardee of this work" it could necessarily then have been "a qualified bidder with a substantial chance of award" if the sole-source had been competitively bid. This conclusory allegation simply ignores the fact that being the awardee of a different (but similar) contract on September 3, 2021, with a different start date, and a longer transition period, does not mean that the Court can simply presume that Plaintiff could have adequately started performing a bridge contract awarded on March 28, 2022,

with a start date of June 10, 2022, that likely had at least some different requirements than the
contract Plaintiff was initially awarded.  At the very least, Plaintiff needed to allege, for
jurisdictional purposes, that it could perform the bridge contract work with the June 10, 2022,
start date and that it could perform the CTSS work called for in the bridge contract (as opposed
to the CTSS IV work that it was awarded).  Plaintiff's complaint simply does not contain the
requisite allegations.

Tellingly, when jurisdiction to protest the bridge contract was challenged by GDIT,
Plaintiff did not cite to either of the above quoted allegations of its third amended complaint to
support jurisdiction.  Rather, Plaintiff cited to several pages in its MJAR, which of course is not
the correct place to plead necessary jurisdictional facts.  Pl.'s Resp. at 12 ("At every stage in this
protest Trace has continuously stated that it is capable of immediately beginning the transition
and of performing the CTSS work as was required by the CTSS IV contract Trace MJAR at 31-
33, 56-60, 61, 63, 72, 74.").[5]  Even if it was the proper place, however, the referenced pages do
not provide the necessary jurisdictional allegations.  Indeed, the first set of cited pages (Pl.'s
MJAR 31–33) indicate that Plaintiff needed ████ days to transition into the CTSS work—a
period of time that was unavailable under the bridge contract.  And the second set (Pl.'s MJAR at
56–60), rather than support Plaintiff, indicate that Plaintiff could not perform the necessary
services on day one of the bridge contract period, but could only perform the services at some
later date after a proper transition period.  *See, e.g.*, Pl.'s MJAR at 57 ("Trace has never
requested that GDIT immediately halt its work. . . .  Trace is in no way requesting that the
current CTSS work be halted and is instead requesting that it simply be appropriately
transitioned. . . .  GDIT will still perform on its contract until June 9, 2022 **or later** due to the
transition of all those employees to Trace . . . ." (internal quotations omitted) (emphasis in
original)).  Buried in a footnote, Plaintiff does cite to the prayer for relief in its third amended
complaint (without parenthetical explanation) in support of the Court's jurisdiction.  Pl.'s Opp. at
12 n.5.  The Court assumes this was a reference to a sentence praying that the Court "[o]rder the
Agency to begin the immediate transitioning of all task orders under CTSS III to Trace under the
restored CTSS IV to avoid any loss of service due to transition."  ECF No. 88 at 48.  Besides not
containing a factual allegation, this sentence also fails to allege the simple, but requisite facts
regarding Plaintiff's ability to timely perform the required bridge-contract work.  *Bell Atl. Corp.
v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a . . . motion to dismiss
does not need detailed factual allegations, a plaintiff's obligation . . . requires more than labels
and conclusions . . . .").

What is more, even if the Court were to credit the above-quoted jurisdictional allegations
as being sufficient, GDIT challenged these jurisdictional facts in its motion to dismiss.  If a
motion to dismiss "challenges a complaint's allegations of jurisdiction, the
factual allegations in the complaint are not controlling and only uncontroverted factual

---

[5] By "[a]t every stage of this litigation," Plaintiff must mean "at every stage of this litigation"
*other than the complaint stage*.  Problematically for Plaintiff, however, the complaint is an essential stage
in litigation for establishing standing.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748
(Fed. Cir. 1988) ("To survive a motion to dismiss for lack of standing, a complaint must contain sufficient
factual matter that would plausibly establish standing if accepted as true."); *see also Rockwell Int'l Corp.
v. United States*, 549 U.S. 457, 473–74 (2007) ("[W]hen a plaintiff files a complaint in federal court and
then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.").

allegations are accepted as true." *Shoshone Indian Tribe of Wind River Reservation v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012) (citing *Cedars–Sinai*, 11 F.3d at 1583). Thus, because GDIT challenged jurisdictional facts, Plaintiff may not rely on the allegations of its complaint to establish jurisdiction (even assuming those allegations were sufficient); it must put forth some sort of evidence for the Court to weigh in order to meet its burden to establish jurisdiction by a preponderance of the evidence. *Mildenberger v. United States*, 643 F.3d 938, 944 (Fed. Cir. 2011) (quoting *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003) ("When the factual underpinnings of the Court of Federal Claims' jurisdiction are contested, the Court of Federal Claims 'may weigh relevant evidence.'")).

Plaintiff, however, offered no evidence in response to GDIT's motion to dismiss supporting its (seemingly unalleged) capability of timely performing the CTSS work called for in the bridge contract. In other words, Plaintiff did nothing in response to the motion to dismiss to attempt to demonstrate that it is actually capable of meeting the agency's bridge contract requirements. Rather, Plaintiff simply repeats its assertion that because it was awarded a different, but similar, CTSS contract for performance during a different time period, with a full transition period, it can perform the work called for in the bridge contract. But, as pointed out above, even in making this argument Plaintiff concedes it was not capable of performing the work on June 10, 2022, when the bridge contract began. Pl.'s MJAR at 57 ("GDIT will still perform on its contract until June 9, 2022[,] **or later** . . . .") (emphasis in original). For purposes of standing, claiming to only be capable of performing a portion of the sole-source contract requirements falls short of Plaintiff's burden. *See CliniComp*, 904 F.3d at 1360 ("CliniComp lacks standing because it failed to demonstrate an ability to perform specific requirements that are set forth in the administrative record."). Once standing was challenged by GDIT, Plaintiff needed to be able to demonstrate with evidence (*e.g.*, a declaration from a responsible officer or employee) that it was capable of performing, on June 10, 2022, without a break in service, the CTSS work called for in the bridge contract. Attempting to meet its burden solely with legal argument in a response brief was insufficient, especially when even that argument itself did not prove enough. In short, Plaintiff had a burden that it did not even attempt to meet.

### 3. Bad Faith

Plaintiff argues that the agency "acted in bad faith, violating its requirement to conduct business with integrity, fairness, and openness." Pl.'s MJAR at 63. Plaintiff asserts that the agency "specifically retaliated against Trace in response to Trace alleging ethical violations against the government," that the "Government's decision to allow contracting officer Katie Couch-Oliver to investigate her own decisions in light of accusations of ethical violations was made in bad faith," that "the inquiry into Steven Dawson was inadequate and conducted in bad faith," and that the "Government's conclusions regarding OCI allegations against Trace and Steven Dawson were done in bad faith with personal animus towards Trace." *See id*. at 64–70.

To prove that the agency acted in bad faith, Plaintiff must meet an extremely high burden. "The government, unlike private parties, is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary." *Torncello v. United States*, 231 Ct. Cl. 20, 45 (1982). Accordingly, a plaintiff alleging bad faith must provide "well-nigh irrefragable proof to induce" the Court to abandon the presumption of good faith. *Knotts v.*

*United States*, 128 Ct. Cl. 489, 492 (1954).  This "irrefragable proof" must include "evidence of some specific intent to injure the plaintiff," *Torncello*, 231 Ct. at 45, as is closely akin to the clear and convincing standard of proof, *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002) ("[W]e believe the clear and convincing standard most closely approximates the language traditionally used to describe the burden for negating the good faith presumption; namely, the "well-nigh, irrefragable" proof standard.").  Plaintiff falls well short of offering "well-nigh irrefragable proof" that the agency specifically wanted to prevent Plaintiff from being awarded the CTSS IV contract.

First, as a practical matter, the agency actually originally awarded the CTSS IV contract to Plaintiff, and nothing that was done pursuant to the corrective action eliminated Plaintiff from future competition for the CTSS contract.  This is hardly the action of an agency with the specific intent to injure Plaintiff.  Second, Plaintiff does not do much more than point the Court to all of the same decisions that the Court has above determined were reasonable and claim that a subset of these actions is evidence of bad faith.  If Plaintiff was unable to demonstrate under a preponderant standard that these actions were unreasonable, it is hard to see how some subset of these actions could amount to the clear and convincing evidence required to demonstrate bad faith.  Simple displeasure with the agency's decisions, or even proving unreasonable government actions, does not amount to bad faith.  Plaintiff has failed to meet its burden to demonstrate that the agency acted in bad faith.

## CONCLUSION

For the reasons set forth above, Plaintiff's motions for judgment on the administrative record and for a permanent injunction are **DENIED**; GDIT's motion to dismiss count II of Plaintiff's complaint is **GRANTED**; and the government's and GDIT's cross-motions for judgment on the administrative record are **GRANTED**.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge

31